IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| ex rel. DANA JOHNSON, | § | |
| | § | |
| Plaintiff-Relator, | § | |
| | § | Civil Action No. 3:17-CV-1098-D |
| VS. | § | |
| | § | , Vj ku'o go qtcpf wo "qr kpkqp"cpf "qtf gt"y cu'hkngf "wpf gt |
| RAYTHEON COMPANY, | § | seal on September 21, 2021 and unsealed at the |
| | § | parties' request on September 24, 2021.  The correct |
| Defendant. | § | date for citation purposes is September 21, 2021. |

MEMORANDUM OPINION
AND ORDER

Plaintiff-relator Dana Johnson ("Johnson") sues defendant Raytheon Company ("Raytheon"), alleging that it retaliated against him for engaging in protected activities, in violation of the antiretaliation provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h)(1).  Raytheon moves to dismiss and/or for summary judgment.  Johnson opposes the motion and requests relief under Fed. R. Civ. P. 56(d).  For the reasons that follow, the court grants in part Raytheon's motion to dismiss, grants Raytheon's motion for summary judgment, denies Johnson's request for relief under Rule 56(d), and enters judgment in favor of Raytheon by judgment filed today.

I

Because the court has addressed the background facts and procedural history of this case in two prior memorandum opinions and orders, *United States ex rel. Johnson v. Raytheon Co.*, 2019 WL 6914967, at *1 (N.D. Tex. Dec. 19, 2019) (Fitzwater, J.); *United States ex rel. Johnson v. Raytheon Co.* (*Johnson I*), 395 F.Supp.3d 791, 793 (N.D. Tex. 2019)

(Fitzwater, J.), it will recount them only as necessary to understand this memorandum opinion and order.

Johnson was a systems engineer aircraft test conductor for Raytheon, a defense contractor with the United States Navy ("Navy").[1]  Johnson worked on a Navy Special Access Program ("Program") that required that Raytheon employees have top secret clearances and be mission critical to the Program.  The government has sole discretion in determining who is granted top secret clearance and who has access to the Program.  Raytheon terminated Johnson's employment in October 2015 following a Navy investigation that resulted in Johnson's losing his security clearance.

Johnson alleges in his second amended complaint that, starting a few years before he was terminated, he became aware that Raytheon was not performing according to its contract with the Navy and had made false claims for payment related to four items.  In the first matter, Johnson informed Brian Cook ("Cook"), a software manager at Raytheon, that a radar mode was malfunctioning due to a software problem.  Johnson fixed the software issue, but the radar modes needed to be recalibrated in order to function.  Cook told Johnson to sign off on the project anyway, and, when Johnson refused because this would involve making a false statement to the Navy, Cook told Johnson that he was going to collect payment from the Navy under the contract in any case.

---

[1]In recounting the factual background, the court summarizes the evidence in the light most favorable to Johnson as the summary judgment nonmovant and draws all reasonable inferences in his favor.  *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.).

During the second matter, which also began a few years before Johnson's termination, Johnson told his then-supervisors, Mike Leddy ("Leddy") and Steve Blazo ("Blazo"), that there was a software problem with the radar system initialization. Johnson suggested to Leddy, Blazo, and his other supervisor, Rocky Carpenter ("Carpenter"), that using a newer version of the software would fix the problem. They told Johnson that the software update would occur in the next few months. About six months before his termination, Johnson discovered that the problem had not been corrected, and he reported this to a Navy flight crew, another test conductor named Rick Scoggins ("Scoggins"), his supervisors, and others. Scoggins angrily told Johnson to be quiet and stop talking to the Navy about the problem. Mark Slater ("Slater"), a member of Raytheon's security department, also instructed Johnson not to talk with the Navy when something was not working properly.

Around the same time that Slater instructed Johnson not to talk to the Navy, Johnson discovered that test equipment purchased by the Navy for Raytheon's use had been damaged and hidden by Raytheon security. Johnson reported this issue to his supervisor and Raytheon's lab managers. He also informed them that their failure to use the equipment violated Raytheon's contract with the Navy.

Johnson then discovered that Raytheon's security department had removed a section of a configuration guide that Johnson had written in order to set up new laptops purchased by the Navy. Johnson informed Carpenter that a section of the guide was missing. Carpenter instructed Johnson to configure the laptops based on his previously submitted instructions, which included the omitted section. Although Johnson was able to complete the

configurations, the omission would cause problems for flight test conductors in the field. Raytheon did not report these issues to the Navy, and collected payment under its contract.

Sometime in late 2014, Raytheon began investigating Johnson for possible security violations. According to Raytheon, regular computer auditing that it conducted under its contract requirements with the Navy revealed that Johnson appeared to be taking actions that the Navy had not approved. Johnson maintains that Raytheon knew that he was not violating any security policies and that Raytheon's decision to report him to the Navy was in retaliation for his investigation of Raytheon's false claims for payment.

In January 2015 Lynne Sharp ("Sharp"), Raytheon's Contractor Program Security Officer, reported her concerns about Johnson's activities to the Navy, as required under Raytheon's contract with the Navy. The Navy alerted the Naval Criminal Investigative Service ("NCIS"), and the Navy and NCIS made the joint determination to investigate Johnson. When Johnson became aware of the investigation, the Navy revoked his access to the Program. The Navy investigated Johnson's activities, and, at the conclusion of the investigation, issued multiple security violations, including for "[u]nauthorized access of need-to-know data" and "[i]ntroduc[ing] network analyzers . . . without advanced approval." D. App. at 14-15. The Navy did not restore Johnson's access to the Program, and Raytheon maintains that Johnson's security clearance was revoked in September 2015.

After receiving the Navy's determination that Johnson had committed multiple security violations, Sarah Humphrey ("Humphrey"), a member of Raytheon's Human Resources department, conducted a disciplinary investigation. At the conclusion of the

investigation, Humphrey provided a report to Raytheon's Human Resources and Security Vice President, Gary LaMonte ("LaMonte"). The report detailed the Navy's findings from its investigation and concluded that Johnson had violated Raytheon's Rules and Regulations. LaMonte terminated Johnson on October 12, 2015.

Following the court's decision in *Johnson I* and the filing of Johnson's second amended complaint, his action against Raytheon has narrowed to the following retaliation claim: in response to his engaging in protected activities concerning the two software problems, the damaged test equipment, and the laptop configuration error, Raytheon retaliated against him in four ways: (1) Raytheon responded with hostility to his reports about the problems and told him not to talk to the Navy; (2) Raytheon increased its monitoring of Johnson; (3) Raytheon made false reports about Johnson to the Navy; and (4) Raytheon terminated Johnson's employment.

In the instant litigation, to address the concerns of Raytheon and the Navy about producing voluminous discovery about classified government information and Johnson's need for discovery to oppose summary judgment, and to avoid a potentially protracted *Touhy*[2] process by the Navy, the court on November 18, 2020 entered an agreed order ("Agreed Order") governing Raytheon's motion for summary judgment and related discovery. Pursuant to the Agreed Order, Raytheon filed a preview of its summary judgment

---

[2]*United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467-68 (1951) (providing that government agencies are permitted to "prescribe regulations not inconsistent with the law" governing the release of information and documents by agency subordinates).

grounds on December 2, 2020; the parties completed discovery related to the summary judgment motion by February 1, 2021; Raytheon filed its summary judgment motion on February 16, 2021; and Johnson filed a Rule 56(d) declaration on March 19, 2021. The court on May 7, 2021 denied Johnson's Rule 56(d) request without prejudice, but allowed Johnson to include a supplemental Rule 56(d) declaration in his response to Raytheon's summary judgment motion. Johnson has responded to Raytheon's motion to dismiss and/or for summary judgment and has supplemented his Rule 56(d) request for relief. The court has heard oral argument on the parties' motions and request.

## II

Raytheon moves under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction Johnson's claim that Raytheon retaliated by monitoring, reporting, and terminating him. "Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citations omitted).

Raytheon also moves for summary judgment as to Johnson's retaliation claim, on which Johnson will bear the burden of proof at trial. Raytheon can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support Johnson's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once Raytheon

- 6 -

does so, Johnson must go beyond his pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in Johnson's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Johnson's failure to produce proof as to any essential element of his claim renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if Johnson fails to meet this burden. *Little*, 37 F.3d at 1075-76.

III

The FCA provides a cause of action for employees who are subjected to adverse employment actions "because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop [one] or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). The familiar *McDonnell Douglas* burden-shifting framework applies to FCA retaliation claims. *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019).

Under this framework, Johnson must first demonstrate a *prima facie* case of retaliation by showing (1) that he engaged in protected activity with respect to the FCA, (2) that Raytheon knew Johnson was engaged in protected activity, and (3) that an adverse employment action occurred because Johnson was engaged in protected activity. *See Thomas v. ITT Educ. Servs., Inc.*, 517 Fed. Appx. 259, 262 (5th Cir. 2013) (per curiam) (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)). As to the third element, the requirement that a plaintiff show at the *prima facie* stage a "causal

- 7 -

link" between a protected activity and an adverse employment action is "much less stringent" than the "but-for" causation that a jury must find. *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *see also Khanna v. Park Place Motorcars of Hous., Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.) (characterizing this *prima facie* case burden as "minimal").

If Johnson establishes a *prima facie* case, the burden shifts to Raytheon to articulate a legitimate, nonretaliatory reason for the alleged retaliatory action. *See Musser*, 944 F.3d at 561; *Walker v. Norris Cylinder Co.*, 2005 WL 2278080, at *9 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.). This burden is one of production, not of proof. *Musser*, 944 F.3d at 561.

If Raytheon meets its production burden, the burden shifts back to Johnson to produce evidence that would enable a reasonable jury to find that retaliation for Johnson's protected conduct, rather than Raytheon's proffered legitimate, nonretaliatory reason, was the but-for cause of the adverse employment action. *Id.*

IV

The court first considers Johnson's termination-based retaliation claim.

A

Raytheon moves for summary judgment on the ground, *inter alia*, that Johnson has failed to establish a *prima facie* case of retaliation because he has not adduced evidence of knowledge or causation. Johnson responds that he has produced direct evidence of

causation.[3]   Johnson also maintains that he has adduced indirect evidence of causation because, at the *prima facie* case stage, the temporal proximity between his protected activity and his termination is sufficient to establish causation.  Furthermore, he contends that he has introduced evidence that shows that the relevant decisionmaker had knowledge of his protected activities.

B

To demonstrate a *prima facie* case of retaliation, Johnson "must produce at least some evidence that the decisionmakers had knowledge of his protected activity."  *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 & n.6 (5th Cir. 2003).  "[M]ere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" may be "sufficient evidence of causality to establish a prima facie case."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam).  The temporal proximity, however, must be very close.  *See id.* (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)).

---

[3]As Raytheon notes in its reply brief, Johnson's "direct" evidence of causation is aimed at proving that his activity was not actually in violation of any security policies.  *See* P. Resp. at 20-22; D. Reply at 15-16.  But as the court explains *infra* at § IV(D)(2), the court lacks subject matter jurisdiction to question the Navy's determination that Johnson committed security violations.

Moreover, direct evidence proves the fact of retaliatory animus without inference or presumption.  *See West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (addressing direct evidence of discrimination).  "Such evidence typically involves statements made by the employer or certain of its personnel that indicate that an employment decision was based on a forbidden factor."  *Bowe v. Exide Corp.*, 2001 WL 705881, at *3 n.1 (N.D. Tex. June 18, 2001) (Fitzwater, J.).  The evidence on which Johnson relies at least requires that inferences be drawn and therefore does not qualify as direct evidence of retaliation.

While Johnson's timeline of events is not entirely clear, it appears undisputed that the period between his protected activities and his termination ranges from at least six months to several years. *See* 2d. Am. Compl. at ¶¶ 4, 8, 12, 21; D. Br. at 35-36; D. App. at 812-13. This is likely too great a gap to enable Johnson to establish his *prima facie* case through temporal proximity alone. *See Aguillard v. La. Coll.*, 824 Fed. Appx. 248, 251 (5th Cir. 2020) (per curiam) ("While a four-month gap may be sufficient evidence of causation, a five-month gap is too long absent other evidence.").

But even assuming that the temporal proximity between Johnson's protected activities and his termination is close enough to help establish causation at the *prima facie* case stage, Johnson has also failed to adduce evidence that LaMonte—the Raytheon employee who made the decision to terminate Johnson—was aware of his protected activity. "Fifth Circuit precedent requires evidence of knowledge of the protected activity on the part of the decision maker and temporal proximity between the protected activity and the adverse employment action." *Ramirez v. Gonzales*, 225 Fed. Appx. 203, 210 (5th Cir. 2007) (per curiam) (citing *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)); *see also Thompson v. Somervell Cnty. Tex.*, 431 Fed. Appx. 338, 342 (5th Cir. 2011) (per curiam). Johnson admits that he has no personal knowledge of whether LaMonte knew about his protected activity. *See* D. App. at 838, 844. And Johnson does not mention LaMonte in his response to Raytheon's interrogatory requesting details about any interaction or communication Johnson had with Raytheon employees regarding his protected activity. *See id.* at 618-23. Instead, Johnson relies on his own speculation that LaMonte, acting as a reasonable

- 10 -

employee in his position, *should have known* about Johnson's protected activity.  *See* P. App. at 10; D. App. at 841-44, 954-55, 957.  Johnson also relies on circumstantial evidence that, when Humphrey prepared the report that LaMonte relied on when he decided to terminate Johnson, she spoke with individuals who knew about Johnson's protected activity.  *See* P. Resp. at 19-20.  But Johnson has not adduced any evidence regarding what these individuals told Humphrey during their conversations.  *See* D. App. at 848-50.  It is therefore questionable whether Johnson has produced enough evidence to establish a *prima facie* case.

But despite these deficiencies in Johnson's proof, "[t]he showing necessary to demonstrate the causal-link part of the *prima facie* case is not onerous," and Johnson "merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *United States ex rel. George v. Bos. Sci. Corp.*, 864 F.Supp.2d 597, 609 (S.D. Tex. 2012) (Rosenthal, J.) (quoting *United States ex rel. Dyson v. Amerigroup Tex., Inc.*, 2005 WL 2467689, at *3 (S.D. Tex. Oct. 6, 2005)).  Because this is a minimal burden and Johnson's claim fails for other reasons, *see infra* at § IV(D)(2) and IV(E), the court will assume *arguendo* that Johnson has met his burden to establish a *prima facie* case of retaliation.

C

Because the court is assuming *arguendo* that Johnson has met his burden to establish a *prima facie* case of retaliation, Raytheon, under the *McDonnell Douglas* burden-shifting framework, must now articulate a legitimate, nonretaliatory reason for terminating Johnson's employment.  Raytheon has produced evidence that it terminated Johnson's employment

solely based on the Navy's determination that he committed numerous serious security violations, which broke not only Navy program requirements, but also multiple Raytheon policies. This is a legitimate, nonretaliatory reason for terminating his employment.

D

Because Raytheon has met its burden of production, the burden has shifted back to Johnson to produce evidence that would enable a reasonable jury to find that retaliation for Johnson's protected conduct, rather than Raytheon's proffered legitimate, nonretaliatory reason, was the but-for cause of his termination. But before the court can decide whether Johnson has met this burden, it must address Raytheon's contention that the court lacks subject matter jurisdiction to review whether Raytheon's proffered, nonretaliatory reason for Johnson's termination (the Navy's finding that Johnson committed numerous serious security violations) is pretextual.

1

Raytheon first contends that, under *Department of the Navy v. Egan*, 484 U.S. 518 (1988), the court lacks subject matter jurisdiction to decide whether Johnson's termination was retaliatory. Johnson responds that the court need not consider whether *Egan* is implicated by his pretext argument because *Egan* does not apply to the facts of this case for a variety of reasons.

In *Egan* the Supreme Court held that the Merit Systems Protection Board could not review the plaintiff's challenge to an executive agency's denial of his security clearance. *Egan*, 484 U.S. at 529-30. The Court reasoned that "the protection of classified information

must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it.  Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a [security] judgment."  *Id.* at 529.  Although *Egan* arose in the context of the Merit Systems Protection Board, the Fifth Circuit and other courts have concluded that *Egan* bars judicial review in the context of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. *See, e.g., Perez v. F.B.I.*, 71 F.3d 513, 514-15 (5th Cir. 1995) (per curiam).

Johnson contends that courts, including the Fifth Circuit, have applied *Egan* to Title VII claims only because that statute makes an exception for actions taken against a person in furtherance of national security.  *See* 42 U.S.C. § 2000e-2(g).  Johnson maintains that, because the FCA does not have such an exception, *Egan* does not apply at all to claims under the FCA.  Raytheon responds, and the court agrees, that Johnson's argument is inconsistent with other courts' application of the *Egan* doctrine.

In *Egan* the Court explained that non-expert bodies should not intrude on agency security clearance determinations "unless Congress has specifically provided otherwise." *Egan*, 484 U.S. at 530.  Based on this, courts have applied *Egan* to other statutes unless specific statutory language demonstrates that Congress intended judicial review of security determinations.  *See, e.g., Hall v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 476 F.3d 847, 852-53 (10th Cir. 2007) (applying *Egan* to whistleblower provisions of various environmental statutes); *Guillot v. Garrett*, 970 F.2d 1320, 1325 (4th Cir. 1992) (applying *Egan* to § 501 of the Rehabilitation Act of 1973).  And although the Fifth Circuit has not addressed the

- 13 -

question whether *Egan* applies to the FCA, it did not rely on Title VII's national security exception when it held that *Egan* applied to claims under Title VII. *See Perez*, 71 F.3d at 514. Johnson does not argue that any specific language in the FCA, besides the lack of an explicit national security exception, demonstrates that Congress intended to allow courts to review security-clearance determinations. Accordingly, the court rejects Johnson's contention that *Egan* is inapposite to claims under the FCA.

Johnson also contends that *Egan* does not apply here because it involves revocation of access to a classified government program rather than revocation of a security clearance. Raytheon responds that *Egan* applies both because Johnson's security clearance was revoked and because, even if Johnson's security clearance was not revoked, his removal from the Program was the kind of security decision that *Egan* shields from review.

Johnson relies on the Fifth Circuit's decision in *Toy v. Holder*, 714 F.3d 881 (5th Cir. 2013), for the proposition that *Egan* applies only to cases in which the plaintiff's security clearance was actually revoked. In *Toy* the Fifth Circuit held that *Egan* did not apply to a Title VII claim made by a contract FBI employee whose building access had been revoked by her supervisor. *Toy*, 714 F.3d at 882, 885-86. The court explained that the revocation of building access in that case was not the kind of "deliberate, predictive judgment[]" that was meant to be shielded by *Egan*, and that "[a] lack of oversight, process, and considered decision-making separates [Toy's] case from *Egan*, which therefore does not bar Toy's suit." *Id.* at 885-86.

Johnson's *Toy* argument fails for multiple reasons. First, Johnson has not adduced

- 14 -

evidence that creates a genuine fact issue with respect to whether his security clearance was or was not revoked.  Raytheon has produced evidence that Johnson's security clearance was revoked in September 2015.  *See* D. App. at 2, 721, 750-51.  Johnson asserts that the Navy revoked his access to the Program, not his security clearance, but he does not produce any evidence that he retained his security clearance after the Navy investigation.

Second, even assuming that Johnson's security clearance was not revoked, this case is distinguishable from *Toy*.  In *Toy* the panel contrasted the building access decision made by a supervisor who "[did] not specialize in making security decisions" with "security-clearance decisions [that] are made by specialized groups of persons, charged with guarding access to secured information, who must make repeated decisions."  *Toy*, 714 F.3d at 885. The court determined that *Egan* applied to the latter category of decisions, but not the former.  *Id.* at 885-86.  The decision to revoke Johnson's access to the Program, and the classified information to which he had access as a part of that program, more closely resemble the category of decisions to which *Egan* applies.  In this case, the program access decision was made by Navy investigators, not Johnson's supervisors at Raytheon.  And the decision was not just about building access; rather, it was about access to the Navy's Program, which required top secret security clearance because it contained sensitive and classified information.  Thus the court concludes that *Egan* applies to this case, and the court must consider next whether it has subject matter jurisdiction to review Johnson's pretext argument.

2

Both parties agree that *Egan* prevents courts from reviewing the Navy's security

- 15 -

investigation and decision.  But Johnson contends that he is not challenging the Navy's determination.  Instead, Johnson posits that he is challenging Raytheon's assertion that it terminated him because of the Navy's security findings, contending it is pretextual because Raytheon knew that Johnson had not actually committed any security violations.

Johnson's retaliation claim is based on an action that is essentially one step removed from the Navy's security determination.  Instead of directly alleging that the Navy's security determination is an adverse employment action, Johnson maintains that Raytheon's assertion that it terminated him based solely on the Navy's determination that he committed multiple serious security violations is pretextual.  In this way, this case is distinguishable from others in which the plaintiff directly challenged the outcome of an agency's security investigation as an adverse employment action.  *See, e.g., Perez*, 71 F.3d at 514-15 (explaining that the court lacked subject matter jurisdiction to review allegations that the FBI's "revocation of [movant-appellant's] security clearance and resulting firing were retaliatory").  Johnson argues that this distinction allows the court to review his claim because he is challenging Raytheon's proffered reason for his termination, not the Navy's underlying security investigation.

The court agrees with Johnson that a court could review a contractor's employment decisions if that review did not implicate the underlying security determination.  *See, e.g., Zeinali v. Raytheon Co.*, 636 F.3d 544, 551-52 (9th Cir. 2011).  But in the instant case, at

- 16 -

least as Johnson frames his primary argument,[4] in order for the jury to determine whether Raytheon's proffered reason for terminating Johnson was legitimate and nonretaliatory or merely pretextual, the jury would inevitably be required to assess the validity of the Navy's investigation and security decision.

Other courts have held that *Egan* bars this type of scrutiny as part of a pretext analysis. *See, e.g., Al-Kaysey v. Engility Corp.*, 2016 WL 5349751, at *10 (E.D.N.Y. Sept. 23, 2016) ("Because [defendants'] proffered reasons for terminating [the plaintiff] were based on the report from the Army that [plaintiff] posed a risk to national security, a review of their decisions, unfavorable to [plaintiff], would require the Court to wade into the same territory that *Egan* prohibits.") (footnote omitted); *Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999) ("[The] court cannot clear the second step of *McDonnell Douglas* without running smack up against *Egan*." Because "[t]he appellants could not challenge the proffered reason's authenticity without also challenging its validity."); *Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 197 (9th Cir. 1995) (holding that *Egan* prevented court from engaging in pretext analysis because evaluating "whether the given reasons were mere pretext" would be impossible without "evaluating their merits").

Despite Johnson's assertion that he is not challenging the Navy investigation or

---

[4]Johnson also maintains that Raytheon's reason for terminating him is pretextual because there were other jobs that he could have performed at Raytheon that did not require a security clearance or access to the Program. Although the court recognizes the possibility that the jury could consider this contention without engaging in questions barred by *Egan*, the court need not now decide this issue because Johnson's termination-based retaliation claim fails for other reasons. *See infra* at § IV(E).

determination, his evidence and briefing reveal that his pretext argument does just that.[5]

Johnson argues that "Raytheon did not terminate Mr. Johnson because of the Navy's findings. Raytheon knew that . . . Mr. Johnson did not have any security violations and that findings were based on Raytheon's false statements to the Navy." P. Resp. at 17. To support this argument, Johnson makes assertions that are contradictory to the Navy statements and reports. For example, Johnson asserts that "[t]he Navy's investigation was not independent. It relied upon Raytheon for its facts and made no independent determination of the violations based on a first-hand examination of the evidence. The first-hand evidence . . . exonerates me." P. App. at 5. Johnson also contends that the Navy has "limited understanding of the matters," and that "[h]ad Raytheon or the Navy confronted [Johnson] openly about the accusations, [he] could show them to be false, as [he] can do in a court of law." *Id.* at 6. Johnson also directly challenges the Navy's findings, *see* D. App. at 14-15, by declaring that he did not introduce any unapproved network analysis software. *See* P. App. at 13-14. And although Johnson now contends that he is not seeking to have his access to the Program reinstated by the Navy, his second amended complaint seeks relief in the form of reinstatement. *See* 2d. Am. Compl. at ¶ 126. Johnson states that he "would expect since the security violation didn't happen, that there would be no reason why not to . . . reinstate

---

[5]Johnson's attorney also contradicted this assertion during a deposition when he stated that, "[b]ut for the investigation, there would not be [the] conclusion[s] that Navy came out [with]—I'm sorry, Navy, but the conclusions are wrong. There would not be those wrong conclusions that . . . Raytheon knows are wrong and has information to know that they're false, and but for that, [Johnson] would not be terminated. That's our argument." D. App. at 1009.

[him]." D. App. at 834.

Johnson's proffered evidence demonstrates that his pretext argument is ultimately aimed at challenging the validity of the Navy's security findings. Thus to resolve Johnson's pretext argument, a jury would have to determine whether the Navy actually conducted an independent investigation, as it asserts that it did, and whether the Navy's findings that Johnson committed multiple security violations were actually incorrect due to their reliance on Raytheon's reports. This is exactly the type of second-guessing of a deliberate, predictive decision made by the Executive Branch that *Egan* forecloses. Because Johnson's pretext argument would require a jury to evaluate the underlying merits of the Navy's security report, the court holds that it lacks subject matter jurisdiction to determine whether Raytheon's proffered reason for Johnson's termination is pretextual.

Because the court lacks subject matter jurisdiction in this respect, it cannot determine whether Johnson can prevail on his termination-based claim based on a showing that Raytheon's proffered reason for terminating his employment is pretextual. Accordingly, it grants Raytheon's motion to dismiss to this extent. *See Ryan*, 168 F.3d at 524 ("Because the district court below could not proceed with the appellants' discrimination action without reviewing the merits of [Department of Justice]'s decision not to grant a clearance, the court was foreclosed from proceeding at all."); *Perez*, 71 F.3d at 514-15 ("Because the court would have to examine the legitimacy and the possibly pretextual nature of the FBI's proffered reasons for revoking the employee's security clearance, any Title VII challenge to the revocation would of necessity require some judicial scrutiny of the merits of the revocation

decision. . . . [N]either we nor the district court have jurisdiction to consider those matters."
(footnote omitted)).

E

Raytheon maintains that, even if court has subject matter jurisdiction, Johnson has failed to produce evidence to rebut Raytheon's legitimate, nonretaliatory reason for terminating him, i.e., he has failed to raise a genuine issue of material fact on the question of pretext. The court now turns to this argument.

Raytheon contends that it is entitled to summary judgment on Johnson's termination-based retaliation claim because he has not adduced evidence that would allow a reasonable jury to find that his engaging in protected activities was the but-for cause of his termination. Johnson responds that he has produced evidence that Raytheon's proffered reason for his termination is false and that Raytheon actually terminated him due to his protected activities. Raytheon replies, *inter alia*, that Johnson is relying on evidence that improperly challenges the Navy's findings[6] and fails to adduce evidence that the relevant decisionmaker knew about Johnson's protected activities.

Johnson has failed to introduce sufficient evidence for a reasonable jury to find that Raytheon's proffered reason for terminating him is pretextual. As the court has explained above, *see supra* at § IV(B), Johnson has not produced evidence that LaMonte—the relevant

---

[6]As the court has explained, *see supra* at § IV(D)(2), it does not have jurisdiction to review Johnson's arguments that challenge the Navy's finding that Johnson committed multiple security violations.

decisionmaker—had knowledge of his protected activities.  At most, Johnson relies on the circumstantial evidence that Humphrey spoke with individuals who had knowledge of Johnson's protected activities, and LaMonte then relied on the report that Humphrey prepared.  But even drawing all reasonable inferences in Johnson's favor, he has not produced sufficient evidence for a reasonable jury to find that someone with knowledge of his protected activities even attempted to influence LaMonte's decision.  The report that Humphrey prepared does not mention any protected activities, and Johnson has produced no evidence about the contents of Humphrey's conversations with the relevant individuals.  This is not enough to demonstrate a genuine issue with respect to LaMonte's knowledge.  *See EEOC v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017) ("[E]vidence of generalized discussions between a decisionmaker and someone with knowledge of the plaintiff's protected activity creates only a speculative inference regarding the decisionmaker's awareness."); *Turner v. Jacobs Eng'g Grp., Inc.*, 470 Fed. Appx. 250, 252-53 (5th Cir. 2012) (per curiam) (explaining that court could not reasonably infer that decisionmaker was aware of plaintiff's protected activity from decisionmaker's single negative comment and general conversations between decisionmaker and employees with knowledge of the protected activity).  The court therefore concludes that, to the extent it has subject matter jurisdiction, Raytheon is entitled to summary judgment dismissing Johnson's termination-based retaliation claim.

V

The court next considers Johnson's retaliation claims based on Raytheon's instructions not to speak with the Navy, Raytheon's monitoring of Johnson, and Raytheon's reporting of Johnson to the Navy.

A

1

Raytheon first contends that the court lacks subject matter jurisdiction under *Egan* to review Raytheon's monitoring and reporting of Johnson because these actions were performed pursuant to Raytheon's contract with the Navy. Johnson responds, *inter alia*, that *Egan* does not bar the court's review of Raytheon's actions because, under *Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012), *Egan* does not apply to false reports made to the government.[7] Raytheon replies that *Rattigan* is distinguishable from the instant case because in *Rattigan* the reports made about the plaintiff were knowingly false and the plaintiff received a favorable final security clearance determination.

2

The court has not found a Fifth Circuit case that discusses the applicability of *Egan* to the initiation of a security investigation. Several other courts, however, have addressed this question and held that the circumstances leading to the instigation of a security clearance

---

[7]Johnson also argues that *Egan* does not apply to this case at all for the reasons discussed *supra* at § IV(D)(1). As the court has already explained, it is not persuaded by these arguments.

investigation are not reviewable. As the Fourth Circuit has explained, "the distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a difference," because "[t]he reasons why a security investigation is initiated may very well be the same reasons why the final security clearance decision is made." *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996); *see also Panoke v. U.S. Army Mil. Police Brigade*, 307 Fed. Appx. 54, 56 (9th Cir. 2009) (unpublished) ("A review of the circumstances surrounding a security clearance [decision] is tantamount to a review of the security clearance itself. Therefore, the circumstances surrounding the revocation of [plaintiff's] security clearance must be precluded from review."); *Hill v. White*, 321 F.3d 1334, 1335-36 (11th Cir. 2003) (per curiam) (rejecting challenge to initiation of security clearance investigation because "[t]o review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized"). But not all courts have reached the same conclusion. In *Rattigan* the D.C. Circuit held that *Egan* does not preclude review of security reports or referrals made with a retaliatory motive based on knowingly false information. *Rattigan*, 689 F.3d at 770-71.

The court is not persuaded that *Rattigan*—even if it were controlling in this circuit—should govern this case. Johnson has not adduced evidence, beyond his own speculative statements, that the individuals responsible for monitoring his activities and reporting him to the Navy did so with knowing falsity.

But even assuming *arguendo* that Johnson has adduced sufficient evidence of knowing falsity, this case is distinguishable from *Rattigan*. The plaintiff in *Rattigan*, unlike

- 23 -

Johnson, received a favorable final security clearance determination from the government. *Id.* at 766.  Other courts have found this to be a meaningful distinction.  *See Al-Kaysey*, 2016 WL 5349751, at *9; *Tharp v. Lynch*, 2015 WL 8482747, at *9 (E.D. Va. Dec. 8, 2015). Here, because the Navy ultimately determined that Johnson had committed multiple security violations, it is readily conceivable that questioning the veracity of the information that Raytheon used to initiate the Navy investigation would be the same as questioning the ultimate conclusions reached by the Navy and NCIS.  For example, if the jury were asked, in essence, to assess the accuracy of Raytheon's report that Johnson may have downloaded unapproved software onto the network, *see* P. App. at 60-62; D. App. at 7-8, this would ultimately draw into question the accuracy of the Navy's final report, which concluded that Johnson had, in fact, downloaded unapproved software.  *See* D. App. at 14.  The court therefore holds that, to the extent that Raytheon's monitoring of and reporting on Johnson initiated the Navy's security investigation, the court lacks subject matter jurisdiction to review these actions.

B

To the extent the court has subject matter jurisdiction to review Raytheon's monitoring of and reporting on Johnson, the court next considers Raytheon's contention that it is entitled to summary judgment on Johnson's retaliation claims that are not based on his termination.

1

Raytheon contends that it is entitled to summary judgment because, *inter alia*,

Johnson has failed to raise a genuine issue of material fact regarding whether Raytheon's non-termination actions were materially adverse employment actions.[8]  Johnson does not respond to this argument in his brief, but he appears to maintain that all of Raytheon's actions were materially adverse.

To constitute prohibited retaliation, an employment action must be a "materially adverse" one that would "dissuade[] a reasonable worker from making or supporting a charge of [an FCA violation]." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted) (discussing retaliation claims in Title VII context).  "The purpose of this objective standard is 'to separate significant from trivial harms' and 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009) (quoting *Burlington N.*, 548 U.S. at 68).  To determine whether a particular employment action is materially adverse, the Fifth Circuit considers whether the action affects factors such as the employee's "job title, grade, hours, salary, or benefits," or whether it caused a "diminution in prestige or change in standing among . . . co-workers." *Paul v. Elayn Hunt Corr. Ctr.*, 666 Fed. Appx. 342, 346-47 (5th

_____

[8]Raytheon also maintains that it is absolutely immune from liability with respect to Johnson's monitoring and reporting-based claims because these actions were required by its contract with the Navy.  The court need not decide the question whether this immunity applies in the context of retaliation claims brought under the FCA because Johnson's claims fail for other reasons. *See infra* at § V(B)(3)-(4), (C)(2), and *supra* at § V(A)(2).  And, in any event, Raytheon does not cite cases that conclude that government contractors have this broad immunity under the FCA; instead, Raytheon relies on decisions holding that government contractors have official immunity from tort liability. *See* D. Br. at 28, 30 n.15.

Cir. 2016) (per curiam) (quoting *Stewart*, 586 F.3d at 332); *see also Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (5th Cir. 2019).

Johnson has not produced evidence that any pre-termination actions by Raytheon had a direct impact on his title, grade, salary, hours, benefits, or social standing at Raytheon.[9] This suggests that, under Fifth Circuit precedent, none of these actions qualifies as a materially adverse employment action. But even looking beyond these factors, Johnson has adduced little evidence that would enable a reasonable jury to find that Raytheon's actions would have dissuaded a reasonable worker in his position from investigating FCA violations.

2

The court first considers whether Raytheon's instructions to Johnson not to report problems to the Navy were materially adverse employment actions. Although under certain circumstances a reprimand can serve as the basis for a retaliation claim, *see Willis v. Cleco Corp.*, 749 F.3d 314, 318 (5th Cir. 2014), the Fifth Circuit has held that isolated warnings, without evidence of direct threats of consequences, do not constitute adverse employment actions. *See, e.g., Hernandez v. Johnson*, 514 Fed. Appx. 492, 498-99 (5th Cir. 2013) (per curiam) (concluding that district court properly granted summary judgment on plaintiff's Title VII retaliation claim because single harassing phone call and letter identifying misconduct were not adverse employment actions); *DeHart v. Baker Hughes Oilfield*

---

[9]Johnson contends that he suffered reputational harm when the Navy interviewed his coworkers, but these adverse consequences are all attributable to actions by the Navy, not Raytheon. *See* D. App. at 860-61, 814.

*Operations, Inc.*, 214 Fed. Appx. 437, 442 (5th Cir. 2007) (per curiam) (concluding that written warning detailing employee's insubordination was not adverse employment action in Title VII context).  Drawing all reasonable inferences in Johnson's favor, he has only adduced evidence that two individuals—who were not his supervisors—told him on isolated occasions not to talk with the Navy.  The court therefore concludes that Johnson has not created a genuine issue of material fact with respect to whether a reasonable worker in his position would have been dissuaded from engaging in protected activity based on these interactions.[10]

3

The court next considers Raytheon's monitoring of Johnson.  The Fifth Circuit has held that an employee's claim that he was being "watched more closely than other[] [employees]" was not a materially adverse employment action.  *Grice v. FMC Techs. Inc.*, 216 Fed. Appx. 401, 404, 407 (5th Cir. 2007) (per curiam).  And other courts have reached similar holdings.  *See, e.g., Pintro v. Pai*, 422 F.Supp.3d 318, 336 (D.D.C. 2019) ("Monitoring an employee's activity or whereabouts is not generally a materially adverse action."); *Soublet v. La. Tax Comm'n*, 766 F.Supp.2d 723, 735 (E.D. La. 2011) ("The Court finds that plaintiff's complaints of increased or altered supervision, criticism and documentation, even when considered together, would not dissuade a reasonable worker

---

[10]Further, Johnson's own testimony reflects that he was *not* dissuaded by these warnings from engaging in future protected activity.  Johnson testified at his deposition that, despite the warnings, he "didn't see any need to change [his] behavior" towards the Navy at all and continued to talk to the Navy "[j]ust as [he] had before."  D. App. at 862.

from making or supporting a charge of discrimination."); *Lopez v. Kempthorne*, 684 F.Supp.2d 827, 893 (S.D. Tex. 2010) (holding that a "supervisor closely monitoring [plaintiff's] work" is not a materially adverse employment action). Some courts, however, have suggested that sufficiently intrusive or severe monitoring could be an adverse employment action. *See Tapia v. City of Albuquerque*, 170 Fed. Appx. 529, 533 (10th Cir. 2006) ("We agree with the district court that sufficiently severe harassing, following, and monitoring of an employee could create an adverse employment action.").

Johnson has not adduced evidence that would enable a reasonable jury to find that Raytheon's monitoring of him was so severe or intrusive as to qualify as a materially adverse employment action. In fact, Johnson produces very little evidence about how Raytheon monitored him or how that monitoring changed after he engaged in protected activity. Johnson relies on a timeline of events (the "Timeline") as evidence that Raytheon was closely monitoring him leading up to the Navy investigation. *See* P. App. at 16, 60-62. But Johnson has not produced evidence about how the monitoring detailed in the Timeline was different from the monitoring that other Raytheon employees were subjected to. Additionally, Raytheon has presented unrefuted evidence that the Timeline was prepared at the request of the Navy *after* it began its investigation, not, as Johnson suggests, over a period of time in order to create a false record about him that could be sent to the Navy.[11]

_____

[11]Because Sharp prepared the Timeline after she had already reported Johnson to the Navy, Johnson's argument that Raytheon's monitoring of him was retaliatory, at least to the extent that it relies on the Timeline as evidence, is better characterized as part of Johnson's argument that Raytheon retaliated against him by making false reports about him to the

*See* P. Resp. at 23; P. App. at 16; D. App. at 485, 744-45, 767, 814, 822.  The court therefore concludes that Johnson has not adduced sufficient evidence for a reasonable jury to find that Raytheon's monitoring of him was a materially adverse employment action.

4

Turning to the component of Johnson's claim based on Raytheon's reporting of Johnson to the Navy, courts have recognized that "an investigation *may* amount to actionable employer conduct." *Rodriguez v. City of Laredo*, 2007 WL 2329860, at *3 (S.D. Tex. Aug. 13, 2007).  Some courts have held that, "while the mere initiation of an investigation is generally not sufficient to constitute adverse action for a retaliation claim, an investigation which carries the prospect of material consequences for the plaintiff may constitute adverse action."  *Cong. v. D.C.*, 514 F.Supp.3d 1, 18 (D.D.C. 2020) (internal quotation marks omitted).  And other courts have held that "[t]he initiation of a formal disciplinary investigation—even one that does not result in formal discipline—would satisfy [the *Burlington Northern*] standard." *Doucet v. Univ. of Cincinnati*, 2006 WL 2044955, at *22 n.19 (S.D. Ohio July 19, 2006), *aff'd on other grounds*, 2007 WL 2445993 (6th Cir. Aug. 28, 2007).

The court concludes on the instant summary judgment record, however, that a reasonable jury could not find that Raytheon's reporting of Johnson to the Navy rose to the level of a materially adverse employment action. For example, Johnson has adduced no

---

Navy.  Raytheon is therefore also entitled to summary judgment on the grounds set out *infra* at § V(C)(2).

evidence that Raytheon's act of reporting him, on its own, had any negative impact on factors such as his salary, title, benefits, or hours. And a reasonable employee would have known, as Johnson did, that Raytheon was required under its Navy contract to report any suspected security violations to the Navy.

C

Assuming *arguendo* that Raytheon's reporting of Johnson to the Navy was a materially adverse employment action, the court next considers whether Johnson has rebutted Raytheon's proffered legitimate, nonretaliatory reason for reporting him, i.e., whether he has raised a genuine issue of material fact on the question of pretext.

1

Raytheon contends that, even if Johnson could adduce evidence to support a *prima facie* claim that reporting him to the Navy was retaliatory, Raytheon has produced a legitimate, nonretaliatory reason for its actions: it was required to report Johnson under its Navy contract. Raytheon posits that Johnson has not produced evidence that Sharp—the Raytheon employee responsible for the decision to report Johnson to the Navy—knew about his protected activity, and, therefore, Johnson cannot establish that his protected activity was the but-for cause of his being reported. Johnson maintains that Sharp had knowledge of his protected activity.[12]

---

[12]Johnson also contends that his behavior was the same as other similarly situated engineers, but that those engineers were not reported to the Navy. For disparate treatment to evidence pretext, however, Johnson "must submit evidence that would enable a reasonable jury to find that a similarly situated employee was treated differently under nearly identical

- 30 -

2

As the court has explained above, *see supra* at § III, once Raytheon has produced a legitimate, nonretaliatory reason for its allegedly retaliatory actions, Johnson must produce evidence that would enable a reasonable jury to find that retaliation for Johnson's protected conduct, rather than Raytheon's proffered legitimate, nonretaliatory reason, was the but-for cause of the adverse employment action. *See Musser*, 944 F.3d at 561. To avoid summary judgment, Johnson must show that the relevant decisionmaker—Sharp[13]—knew about his *protected activity*. It is not enough for Johnson to produce evidence that Sharp knew that Johnson had made general complaints about actions taken by Raytheon, because Johnson must show that Sharp knew that Johnson was investigating fraud or attempting to expose Raytheon's illegal activity. *See U.S. ex rel. Patton v. Shaw Servs., L.L.C.*, 418 Fed. Appx. 366, 372-73 (5th Cir. 2011) (per curiam); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir. 1994) (finding no protected activity where employee "never characterized his concerns as involving illegal, unlawful, or false-claims investigations").

---

circumstances." *Turner v. Republic Waste Servs. of Tex., Ltd.*, 2016 WL 7178968, at *4 (N.D. Tex. Dec. 8, 2016) (Fitzwater, J.) (citing *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005)). Johnson has not adduced such evidence. For example, Johnson avers that "another engineer used Wireshark in the same manner as me, but was not investigated or terminated," P. App. at 14, and that "[o]ther Raytheon employees also used the Boeing desktops." *Id.* at 15. But Johnson has not produced proof about how these employees were otherwise similarly situated to him. Nor does he contend that these employees committed multiple security violations. Accordingly, a reasonable jury could not find that these employees were treated differently under "nearly identical" circumstances.

[13]Although LaMonte was the decisionmaker with regard to Johnson's termination, Sharp was the decisionmaker concerning making the report to the Navy.

Sharp avers that she was not aware that Johnson had engaged in any protected activity when she made the decision to report him to the Navy. And while Johnson asserts that Sharp did know of his protected activity, he has not produced any evidence that he specifically made Sharp aware that he was investigating fraud or was concerned that Raytheon was doing something illegal. Instead, Johnson relies on the fact that Sharp was present at some of the meetings where Johnson raised the issue that the flight laptops were missing a part of their configuration guide. But Johnson does not show which meetings Sharp attended, some of which occurred before she joined the security team for the Program. *See* D. App. at 844-45. Johnson also does not allege in his second amended complaint or produce evidence that he discussed at these meetings his concerns that Raytheon was engaged in fraudulent activities. Additionally, in his response to Raytheon's interrogatory requesting details about any interaction or communication that Johnson had with Raytheon employees regarding his protected activity, Johnson does not aver that he communicated with Sharp about his protected activities. *See id.* at 618-23. The court therefore concludes that Johnson has failed to raise a genuine fact issue as to whether Raytheon's reporting him to the Navy would not have occurred but for his protected activity.[14]

---

[14]Even if the court assumes *arguendo* that Johnson has adduced sufficient evidence to raise a genuine fact issue as to whether Sharp knew about Johnson's protected activity, which the court doubts, Raytheon is still entitled to summary judgment on the basis that Raytheon's monitoring of and reporting on Johnson were not materially adverse employment actions. *See supra* at V(B)(3)-(4).

- 32 -

D

Accordingly, the court concludes that, to the extent Raytheon's monitoring of and reporting on Johnson initiated the Navy's security investigation, the court lacks subject matter jurisdiction to review these actions.  But even if the court assumes that it has subject matter jurisdiction, a reasonable jury could not find that Raytheon's instructions to Johnson not to report problems to the Navy, Raytheon's monitoring of him, and Raytheon's reporting of him to the Navy were materially adverse employment actions.  And assuming *arguendo* that Raytheon's monitoring of and reporting on Johnson to the Navy were materially adverse employment actions, Johnson has failed to raise a genuine fact issue as to whether Raytheon's monitoring him and reporting him to the Navy would not have occurred but for his protected activities.

VI

The court previously denied Johnson's request for Rule 56(d) relief but gave him an opportunity to supplement that request in his response to Raytheon's motion for summary judgment.  The court now considers whether Johnson's supplemental declaration meets the standard for obtaining Rule 56(d) relief.

A

"[Rule 56(d)] is an essential ingredient of the federal summary judgment scheme and provides a mechanism for dealing with the problem of premature summary judgment motions."  *Parakkavetty v. Indus Int'l, Inc.*, 2004 WL 354317, at *1 (N.D. Tex. Feb. 12, 2004) (Fitzwater, J.) (citing *Owens v. Estate of Erwin*, 968 F.Supp. 320, 322 (N.D. Tex.

1997) (Fitzwater, J.) (referring to former Rule 56(f), which was replaced by Rule 56(d)). Under Rule 56(d), the court can "(1) defer considering the [summary judgment] motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order," provided that the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Rule 56(d). Rule 56(d) is "usually invoked when a party claims that it has had insufficient time for discovery or that the relevant facts are in the exclusive control of the opposing party." *See Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 136 (5th Cir. 1987) (referring to Rule 56(f)). Rule 56(d) offers relief where the nonmovant has not had a full opportunity to conduct—not to complete—discovery. The two concepts are distinct. *See McCarty v. United States*, 929 F.2d 1085, 1088 (5th Cir. 1991) (per curiam) (citing *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1985)) (rejecting nonmovant's contention that district court abused its discretion by failing to permit him to complete discovery before granting summary judgment, and holding that "Rule 56 does not require that discovery take place before granting summary judgment").

"[Rule 56(d)] motions are broadly favored and should be liberally granted." *Culwell v. City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006). Nevertheless, to warrant a continuance for purposes of obtaining discovery, "a party must indicate to the court by some statement . . . why he needs additional discovery and *how* the additional discovery will create a genuine issue of material fact." *Stults v. Conoco, Inc.*, 76 F.3d 651, 657-58 (5th Cir. 1996) (quoting *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993)). It is not

sufficient for a summary judgment nonmovant to allege that discovery is incomplete or that discovery will produce needed but unspecified facts. *See Washington*, 901 F.2d at 1285. The party must demonstrate "how the additional time will enable [it] to rebut the movant's allegations of no genuine issue of fact." *Id.* at 1286 (quoting *Weir v. Anaconda Co.*, 773 F.2d 1073, 1083 (10th Cir. 1985)). A nonmovant is not entitled to a continuance if he "fail[s] to explain what discovery [he] did have, why it was inadequate, and what [he] expected to learn from further discovery" and gives only "vague assertions of the need for additional discovery." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 968 (5th Cir. 1999) (quoting *Reese v. Anderson*, 926 F.2d 494, 499 n.5 (5th Cir. 1991)).

B

Johnson incorporates his original Rule 56(d) declaration into his response to Raytheon's motion for summary judgment and supplements it with an additional three page declaration in his appendix to his response brief. Johnson states that he needs to depose several people who had a retaliatory purpose and referred knowingly false information to the Navy or communicated with Humphrey before Johnson's termination. Johnson also contends that Raytheon refused to allow depositions of several of these individuals. Raytheon contends in its reply brief that Johnson's supplemental Rule 56(d) declaration does nothing to cure the deficiencies of the reincorporated declaration. Raytheon also maintains that Johnson has still not satisfied the standard for Rule 56(d) relief because he does not identify what specific facts he expects to learn from these specific witnesses or how this additional discovery will create a genuine issue of material fact. Raytheon also contends that Johnson

had the opportunity to depose key witnesses, such as Humphrey, but never requested or noticed such depositions.  Johnson did not address the deficiencies of his Rule 56(d) declaration at oral argument.

The court agrees with Raytheon that Johnson's supplemental Rule 56(d) declaration does not cure the defects of his original, incorporated Rule 56(d) declaration.  Johnson still has not identified what specific facts he expects to learn from the witnesses he seeks to depose.  And although Johnson asserts that Raytheon refused discovery of key witnesses, he does not support that claim with evidence that he even attempted to obtain such discovery.  Thus Johnson also fails to identify how the discovery he has already been allowed is inadequate to oppose Raytheon's motion.  The court therefore denies Johnson's request for Rule 56(d) relief.

\* \* \*

For the foregoing reasons, the court grants in part Raytheon's motion to dismiss and grants Raytheon's motion for summary judgment, denies Johnson's request for Rule 56(d) relief, and enters judgment in Raytheon's favor.

**SO ORDERED**.

September 21, 2021.

SIDNEY A. FITZWATER
SENIOR JUDGE

- 36 -